PROCHROMA, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 97–139.

United States Court of Federal Claims.

May 30, 2000.

Arthur L. Lessler, South River, NJ, for Plaintiffs.

B. Frederick Buchan, Jr., Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant, with whom were Vito J. DiPietro, Director, and David W. Ogden, Acting Assistant Attorney General; Thomas J. Byrnes, of counsel.

Ruth E. Ganister, West Chester, PA, Stephen R. Risley, Atlanta, GA, for Intervener Southern Mills, Inc.

Blas P. Arroyo, Charlotte, NC, for Intervener Springs Industries, Inc.

### OPINION

DAMICH, Judge.

The complaint in this patent infringement action was filed March 5, 1997. The case is presently before the Court on the Combined Motion of Defendant and Interveners for Partial Summary Judgment as to Claim Construction filed July 2, 1999. A hearing was held regarding claim construction at which only intrinsic evidence was considered. After the hearing, the Court propounded certain questions of a technical nature as background information to be answered by the parties' experts.[1] After full consideration of the briefs and arguments of the parties, the background information of the experts and the language of the patent as it plainly reads, the Court construes the claims of United

---

1. Plaintiffs offered as an expert, David Michael Hall, Professor Emeritus, Department of Textile Engineering of the School of Engineering at Auburn University. James D. Hodge, Ph.D., served as Defendant's expert. He is a retired research scientist currently working as a consultant in the area of NOMEX aramid dyeing.

States Patent No. 4,525,168, as herein set out.

## Background

Plaintiffs assert in this action brought under 28 U.S.C. § 1498(a) that U.S. Patent 4,525,168 entitled "Method of Treating Polyaramid Fiber" (the '168 patent or the Kelly patent) has been infringed by Defendant and the Third–Party Interveners, Southern Mills, Inc. (Southern) and Springs Industries, Inc. (Springs), who manufacture and dye the uniforms under government contract for use by various government agencies. The '168 patent was issued June 25, 1985, from Application No. 574,323, filed January 27, 1984, (the '323 Application). It was issued to Professional Chemical & Color, Inc., the assignee of David R. Kelly (Kelly), the inventor. Plaintiff Professional Color Systems, Inc., is the owner of record in the United States Patent and Trademark Office.

The '168 patent teaches a method for pretreating polyaramid fibers, such as NOMEX® and KEVLAR® sold under trademark by E.I. du Pont de Nemours and under the trademark CONEX® by TeiJin Corp. Anionic dyes include acid dyes, acid premetalized dyes and certain direct dyes. The pretreatment makes it possible to dye and/or to print polyaramid fibers with anionic dyes that have dark colors and good color-fastness properties.

## Standard of Review

A patent must be written such that it explicitly reveals, to one schooled in the art to which it speaks, the precise scope of the invention that is to be protected for the duration of the patent term, in order to "secure to [the patentee] all to which he is entitled, [and] to apprise the public of what is still open to them." *McClain v. Ortmayer*, 141 U.S. 419, 424, 12 S.Ct. 76, 35 L.Ed. 800 (1891).

Determination of claim construction, including the terms of art found therein, is a matter of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 34 USPQ2d 1321 (Fed.Cir.1995)(en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996). The Court of Appeals for the Federal Circuit has approved the procedure of deciding claim construction issues by summary judgment. *See Unidynamics Corp. v. Automatic Products Int'l Ltd.*, 157 F.3d 1311, 48 USPQ2d 1099 (Fed.Cir.1998). An infringement analysis is a two-step process in which the court must first determine the scope of the claims and then compare the properly construed claim to the accused device to determine whether all of the claim limitations are present either literally or by a substantial equivalent. *See General Mills, Inc. v. Hunt–Wesson, Inc.*, 103 F.3d 978, 981, 41 USPQ2d 1440, 1442 (Fed.Cir.1997). "In 'claim construction' the words of the claims are construed independent of the accused product ... [and] it is efficient to focus on the construction of only the disputed elements or limitations of the claims ... [as] a way of elaborating the normally terse claim language: in order to understand and explain, but not to change, the scope of the claims." *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1580, 18 USPQ2d 1001 (Fed.Cir.1991).

The Federal Circuit has instructed that, "when construing a claim, a court should look first to the intrinsic evidence, i.e., the claims themselves, the written description portion of the specification, and the prosecution history." *Bell & Howell Document Management Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706, 45 USPQ2d 1033, 1037 (Fed.Cir.1997). The construction of patent claims necessarily begins with a review of those claims. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582, 39 USPQ2d 1573, 1576 (Fed.Cir.1996). The court's interpretation must "accord with the words chosen by the patentee to stake out the boundary of the claimed property." *Renishaw PLC v. Marposs S.P.A.*, 158 F.3d 1243, 1248, 48 USPQ2d 1117, 1121 (Fed.Cir.1998). "Only if there were still some ambiguity in the claim, after consideration of all available intrinsic evidence, should the trial court have resorted to extrinsic evidence, such as expert testimony, in order to construe [the claim]." *Vitronics*, 90 F.3d at 1584.

Extrinsic evidence is properly used to clarify any "genuine ambiguity" that remains "after consideration" of the intrinsic evi-

dence. *Id.* After considering the intrinsic evidence, the court may also "consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1309, 51 USPQ2d 1161, 1168 (Fed.Cir.1999).

## Discussion

The '168 patent contains 11 claims; two are independent claims, Claim 1 and Claim 8.

**Claim 1.** A method of treating polyaramid fiber, comprising the steps of:

swelling the fiber,

introducing into the swollen fiber a substance capable of forming an ionic bond with an anionic dye, and

shrinking the fiber so as to incorporate said substance

into the fiber.

Col. 4, lines 60–66.

**Claim 8.** A method of treating polyaramid fiber, comprising the steps of:

exposing the fiber to a solvent which causes the fiber to swell,

while the fiber is swollen, exposing it to an amine or substituted amine capable of forming an ionic bond with an anionic dye so that the amine permeates the fiber, and

drying the fiber to incorporate the amine into it.

Col. 6, lines 1–9. The other nine are dependent claims. The Court will be concerned here with the construction of Claim 1 which is the broadest claim and therefore determines the scope of what is protected under the patent.

Defendant and Interveners present the following three questions for the Court's determination:

(1) Whether the intrinsic evidence establishes that Claims 1 to 11 are limited to cover only polyaramid fiber pretreatment processes wherein shrinking or drying to incorporate the dye site substance into the fibers is completed prior to introducing or exposing the fibers to any anionic dye.

(2) Whether the intrinsic evidence establishes that Claims 1 to 11 cover only those processes wherein one substance is used for swelling the polyaramid fiber and a different substance is introduced and subsequently incorporated into the fiber as the dye site substance.

(3) Whether the intrinsic evidence establishes that Claims 1 to 11 are limited to cover only processes using the described amines or substituted amines (or their equivalents) as the dye site substances and do not cover processes using other substances such as amides for the purpose.

I. **Whether the intrinsic evidence establishes that Claims 1 to 11 are limited to cover only polyaramid fiber pretreatment processes wherein shrinking or drying to incorporate the dye site substance into the fibers is completed prior to introducing or exposing the fibers to any anionic dye.**

Defendant asserts that the intrinsic evidence unambiguously establishes that the claims cover only a "method of treating polyaramid fiber" wherein the three pretreatment steps recited in Claims 1 or 8 have been completed *prior to* any dyeing of the fiber with an anionic dye. In support, Defendant presents four general arguments. The Court addresses each of these below.

A. Express Language

First, Defendant argues that the express language of the claim rules out the possibility of exposing the fiber to an anionic dye during the swelling and dye site substance introduction steps of Claim 1 before the shrinking step has been completed. Defendant argues that if the dye is present during the time when the dye site substance is being introduced, that substance will no longer be "capable" of forming the required ionic bonds because those bonds will already have been formed.

In response, Plaintiffs argue that the express language of Claim 1 does not preclude the introduction of dye prior to completion of pretreatment. Plaintiffs argue that, al-

though Claim 7 specifically recites the step of dyeing the fiber after completion of the pretreatment, nothing in the language of Claim 7 excludes an additional dyeing step before or during pretreatment.

The Court disagrees with Defendant's interpretation of the claim language. The express language of Claim 1 of Plaintiffs' patent does not preclude from its scope introducing or exposing the fibers to anionic dye prior to shrinking or drying to incorporate the dye site substance into the fibers, *as long as some dye site substance capable of forming an ionic bond with an anionic dye remains after shrinking or drying.* In other words, the express language of Claim 1 does not preclude some dyeing before or during the "shrinking" step, as long as some dyeing can occur after the "shrinking" step, that is, after pretreatment.

Claim 1 of the '168 patent states:

A method of treating polyaramid fiber, comprising the steps of:

swelling the fiber,

introducing into the swollen fiber a substance capable of forming an ionic bond with an anionic dye, and

shrinking the fiber so as to incorporate said substance into the fiber.

Col. 4, lines 60–66.

■ The process of claim construction begins with giving the words of a claim their ordinary meaning unless there is specific evidence that the inventor gave them a different meaning. *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620, 34 USPQ2d 1816, 1819 (Fed. Cir.1995). In this case, Claim 1 is well-defined and clear and does not mention dyeing. Additionally, Claims 2 to 6 and 8 to 11 contain no mention of dyeing. Thus, Plaintiffs correctly argue that these claims cannot be interpreted as limiting them to dyeing only after pretreatment.

The Court agrees with the Defendant that in order to be "a substance capable of forming an ionic bond with an anionic dye" the dye site substance must not have already bonded with the anionic dye. If it has bonded, then it is no longer "capable" of bonding; it *has* bonded. Thus, to be within the scope of the "shrinking" step of Claim 1, some of the dye site substance must not have already bonded with the anionic dye. Or, to put it another way, some of the dye site substance must be able to bond with the anionic dye *after* the "shrinking" step.[2]

This does not mean, however, that an anionic dye cannot be present before or during the "shrinking" step. But if an anionic dye is present before or during the "shrinking" step, it must not have "used up" all of the dye site substance by bonding with it. If that were the case, there would be no dye site substance still capable of bonding after the "shrinking" step. As has been stated, according to Claim 1, some of the dye site substance must be present in its unbonded or "capable of forming an ionic bond with an anionic dye" state after the "shrinking" step.

As Claim 1 is broader than the other independent claim, Claim 8, the Plaintiffs' patent includes introducing or exposing the fibers to anionic dye prior to shrinking or drying to incorporate the dye site substance into the fibers, if, as the Court decides, this activity is within the scope of Claim 1. But Claim 8 is susceptible to a similar analysis. In Claim 8, the amine or substituted amine that is incorporated into the fiber through drying must be "capable of forming an ionic bond with an anionic dye." Even if some of the amine or substituted amine has bonded prior to incorporation because of the introduction of the anionic dye before this step, as long as some of the amine or substituted amine may still bond with an anionic dye after the incorporation step, the introduction of anionic dye before or during the incorporation step is within the scope of Claim 8.[3]

In sum, the express language establishes that Claims 1 to 11[4] are not limited to cover

---

2. The phrase "said substance" in the "shrinking" step has as its antecedent "a substance capable of forming an ionic bond with an anionic dye."

3. "[T]he amine" in the incorporation step of Claim 8 has as its antecedent "an amine or substituted amine capable of forming an ionic bond with an anionic dye."

4. Claims 2–7 depend from Claim 1, and Claims 9–11 depend from Claim 8.

only polyaramid fiber pretreatment processes wherein shrinking or drying to incorporate the dye site substance into the fibers is completed prior to introducing or exposing the fibers to *any* anionic dye.

## B. Specification

Defendant's second argument is based on the specification of the patent. Defendant argues that the claims are limited by the stated objects of the invention. Defendant notes that any reader of the '168 patent would understand that the pretreatment process of the invention is performed to incorporate the dye site substance into the fiber before any dyeing occurs. Specifically, Defendant focuses on three statements in the specification. The first statement is the first paragraph of the written description which reads, "This invention relates generally to dyeing and printing of polyaramid fiber, and products made therefrom, and more particularly to a pretreatment of the fiber prior to dying [sic] or printing on it." Col. 1, lines 4–7. The second statement Defendant points out reads, "It is another object of the invention to provide a method of pre-treating polyaramid fiber, prior to dying [sic], to provide dye sites in the fiber capable of reacting with anionic dyes." Col. 1, lines 47–50. Lastly, Defendant notes the following statement, "[A]fter a polyaramid product has been pretreated as described above, it can be successfully dyed by an anionic dye." Col. 3, lines 20–48.

■ The Federal Circuit has emphasized that, "[w]hile . . . claims are to be interpreted in light of the specification and with a view to ascertaining the invention, it does not follow that limitations from the specification may be read into the claims." *Sjolund v. Musland*, 847 F.2d 1573, 1581, 6 USPQ2d 2020, 2027 (Fed.Cir.1988); *See Texas Instruments, Inc. v. United States Int'l Trade Comm'n*, 805 F.2d 1558, 1563, 231 USPQ 833, 835 (Fed.Cir. 1986) ("This court has cautioned against limiting the claimed invention to the preferred embodiments or specific examples in the specification.") It has been made abundantly clear that there must be an unclear word, term or phrase in the claims before resort is had to consideration of other intrinsic evidence for clarification. "[A] claim must explicitly recite a term in need of definition before a definition may enter the claim from the written description." *Renishaw PLC*, 158 F.3d at 1248, 48 USPQ2d at 1121 (Fed.Cir. 1998).

The Court disagrees with Defendant's contention that the quoted statements from the specification limit in someway the language of Claim 1. The Federal Circuit has stressed that courts may not read limitations from the specification not present in the claims. *Sjolund* 847 F.2d at 1581, 6 USPQ2d at 2027. Yet this is precisely what Defendant asks this Court to do. Moreover, the Court finds no limitations in the specification. Defendant asks this Court to presume and to read into the specification, by implication, something that is not directly stated. After a careful reading of the above statements, this Court cannot conclude that these statements preclude the addition of dye prior to or during pretreatment. Moreover, nothing in Claim 1 precludes the presence of dye prior to completion of pretreatment. In order to benefit from the pretreatment process what is clear is that dye must be present after or simultaneously with a substance capable of forming an ionic bond with it. The Court cannot draw the conclusion that no dye can be present prior to or during the pretreatment process.

Defendant also relies on *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479, 45 USPQ2d 1498 (Fed.Cir.1998) for the proposition that claims may be no broader than the supporting disclosure. A narrow disclosure will serve to limit claim breadth. *Id.* However, the present case is distinguishable from *Gentry*.

In *Gentry*, the Federal Circuit found that the written description of the patent did not support certain of the broader of claims asserted by Plaintiffs. *Id.* at 1474. The case concerned a patent for a sectional sofa that placed a console between two recliners which face in the same direction. *Id.* at 1475. The console held the controls for both reclining seats. *Id.* The issue was whether the controls could be located in places other than the console. The Federal Circuit concluded that the disclosures of the patent unambiguously

limited the location of the controls to the console. *Id.* at 1480. The Court found that the only "discernable purpose for the console" was to "house the controls." *Id.* at 1479.

Unlike *Gentry,* the specification in this case does not include statements that expressly preclude the addition of dye prior to completion of pretreatment. In contrast, in *Gentry,* the Federal Circuit found clear statements in the written description that unambiguously described that the only purpose of the console was to house the controls for the reclining seats. *Id.* at 1479. Thus, the Court concluded that "one skilled in the art would clearly understand that it was not only important, but essential" to the invention "for the controls to be on the console." *Id.* at 1480. Here, the specification does not contain such limitations that preclude the presence of dye prior to or during pretreatment.

Defendant further argues that the specification of the '168 patent is very narrow, in that it neither discloses nor suggests that a dye can or should be added into the pretreatment process prior to shrinking the pretreated fabric to complete the process. In support, Defendant cites the following language in the specification as evidence that fibers can be dyed only after the pretreatment process is completed:

> according to the present invention ... fiber ... is caused to swell. While in the swollen condition, there is introduced into the fiber a substance capable of forming a strong chemical bond with an anionic dye. The fiber is then allowed to shrink back to its original condition and thereby incorporate the dye site substance into it. In this way, the fiber is provided with dye sites capable of bonding with anionic dye, whereby the fiber can be dyed or printed with an anionic dye.

Col. 1, line 61 to Col. 2, line 2.

Although there is an implication that dyeing occurs after the pretreatment process, the above language does not preclude dye being present prior to or during the pretreatment process. It is not necessary for the specification to recite or suggest every possibility regarding the addition of dye during the pretreatment process. What is clear is that dye must be present after or simultaneously with a substance capable of forming an anionic bond with it. Thus, the specification can be read to be consistent with Claims 1 and 8. But in any event the specification cannot limit the claims. *See E.I. du Pont de Nemours & Co. v. Phillips Petroleum, Co.,* 849 F.2d 1430, 1433, 7 USPQ2d 1129, 1131 (Fed.Cir.1988).

## C. Prosecution History

Defendant presents three arguments based on the prosecution history of the '168 patent. First, Defendant contends that the inventor of the '168 patent, David R. Kelly, disclaimed dyeing before the completion of the pretreatment process. According to Defendant, Kelly repeatedly argued to the PTO that the claimed invention pertained to a fiber pretreatment process that is completed before any dyeing with anionic dyes. For example, Defendant cites the following statements to the Commissioner of Patents and Trademarks on February 7, 1985, "After this pretreatment has been accomplished, the polyaramid can be dyed with an anionic (or acid) dye." *See Statement to the United States Patent and Trademark Office* at 1(Feburary 7, 1985). "It is important to note that the pretreatment according to the present invention takes place prior to, and is completed before, dyeing of the fiber." *Id.*

Second, Defendant argues that the word "capable" was used consistently in the specification and throughout the prosecution history of the '168 patent as requiring that the "substance" has not yet come in contact with a dye. For this proposition, Defendant points to a statement by Kelly in a letter to the Commissioner of Patents and Trademarks dated September 17, 1984, which reads as follows:

> The essence of the present invention is described in the paragraph bridging pages 2 and 3 of the present specification. It is there stated that "According to the present invention, polyaramid fiber ... is caused to swell. While in the swollen condition, there is introduced into the fiber a substance capable of forming a strong chemical bond with an anionic dye. The fiber is

then allowed to shrink back to its original condition and thereby incorporate the dye site substance into it." Thus, the method of the present invention involves the following steps:

(1) contact the polyaramid with a substance which causes it to swell;

(2) contact the swollen polyaramid with a substance which has an affinity for anionic dyes (this step may be performed simultaneously with the first step): and

(3) dry the polyaramid.

After this pretreatment has been accomplished, the polyaramid can be dyed with an anionic dye. *See Statement to the United States Patent and Trademark Office* at 2 (September 18, 1984).

In response, Plaintiffs argue that the statements cited by Defendant, when read in context, mean that the pretreatment takes place before a dyeing operation that is to benefit from the pretreatment.

 "Explicit statements made by a patent applicant during prosecution to distinguish a claimed invention over prior art may serve to narrow the scope of a claim." *Spectrum Inter. Inc. v. Sterilite Corp.* 164 F.3d 1372, 1378, 49 USPQ2d 1065 (1998) (citing *Digital Biometrics, Inc. v. Identix, Inc.,* 149 F.3d 1335, 1347, 47 U.S.P.Q.2d 1418, 1427 (Fed.Cir.1998)). Thus, "claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." *Unique Concepts, Inc. v. Brown,* 939 F.2d 1558, 1562, 19 USPQ2d 1500, 1504 (Fed.Cir.1991).

 In every instance cited by Defendant, the inventor made affirmative statements about the pretreatment preceding the dyeing of the fiber. The Court agrees that there is a necessary implication in the above statements that "pretreatment" will be followed by a dye step. The inverse conclusion that no dye may already be present is not in any way a necessary corollary. The Court agrees with Plaintiffs. When the statements are read in context, the inventor meant to stress that pretreatment takes place before a dyeing operation that is to benefit from the pretreatment. In other words, the dye ap-

plied after pretreatment reacts with dye sites which were implanted in the fiber by the pretreatment process. The Court cannot conclude from the above statements that Plaintiffs disclaimed the presence of dye prior to completion of the pretreatment. An additional step wherein a relatively small amount of dye is added to the pretreatment bath does not alter the efficacy of the pretreatment process, which still makes the fiber receptive to subsequent dyeing or printing with anionic dyes. This is due to the fact that a large number of dye sites remain available to accept dye after the pretreated fabric is shrunk.

As an alternative argument about the prosecution history, Defendant contends that the prosecution history includes representations in which Plaintiffs disclaimed a dyeing step prior to completion of the pretreatment process in order to distinguish the claims of the '168 patent from prior art.

Kelly's application for a patent was rejected by the PTO twice before granting of the '168 patent on June 25, 1985. All claims were rejected primarily on the basis of the Moussalli patent 3,564,630. The Moussalli patent teaches "a process for increasing the deep dye characteristics of polyamides, ... the process involves pretreating the fiber in yarn or fabric form with a long chain alkyl aromatic quaternary ammonium salt and subsequently dyeing the fiber with an acid dye". '630 patent; Abstract.

On February 5, 1985, in an attempt to distinguish his patent from the Moussalli patent, Kelly presented samples to the PTO. Defendant contends that the primary difference between the Moussalli patent and the Kelly patent was that the Moussalli sample was dyed prior to drying, whereas the Kelly sample was dried first, and after the Kelly fabric was dried, the pretreated "fabric was then dyed" in the same manner as the Moussalli sample. The Court disagrees with Defendant.

In response to the initial rejection of the '323 application, Plaintiffs distinguished Moussalli as follows:

However, there is no suggestion in Mousalli [sic] that the polyamide be swelled so as

to facilitate penetration of the dye site substance into the polyamide. Consequently, Mousalli's [sic] dye site substance will remain on the surface of the polyamide . . .

Mousalli [sic] then uses a swelling agent in combination with the dye bath . . . However, there is no dye site substance within the polyamide with which the dye can form a chemical bond. The dye site substance is only on the exterior of the polyamide.

*Statement to the United States Patent and Trademark Office,* at 3 (Sept. 18, 1984).

This distinction is considered crucial by the inventor because it is immediately repeated as the distinguishing feature of his process over Moussalli. *See Id.* at 4. There is no emphasis of the drying step as crucial in this petition for reconsideration of the application.

The PTO also focused on the swelling step as the crucial difference of the '323 application over Moussalli. "Moussalli . . . differs from the instant method only in that it does not teach the step of swelling the substrate prior to or simultaneously with treatment with the quaternary ammonium or nitrogen compound." *See Examiner's Action to Responsive Communication* filed on September 20, 1984.

On the February 6, 1985 Examiner Interview Summary Record, the swelling step, not the drying step is crucial to the allowance of the '323 application over Moussalli. "Mr. Levine and Mr. Kelly presented a declaration which proposed to show the unobviousness of pretreating the aramide fiber by swelling before dyeing. I reviewed the declaration and indicated that it apparently was adequate to overcome the rejection over Moussalli." This statement was signed by the examiner. *See Examiner Interview Summary Record* (February 6, 1985).

Defendant relies heavily on the fact that the samples presented to the PTO comparing the Kelly process with the Moussalli process did not use the 5 grams per liter Carolid recited in example 1 of the Moussalli patent. Carolid is a sodium salt of ortho phenyl phenol marketed by Tanex Co. '630 patent; Col. 4, lines 18–19. Ortho phenyl phenol is

the preferred carrier of the Moussalli invention. *Id.* at Col. 3, lines 73–74. A "carrier" is "any organic compound which loosens the tight bonding between the long fiber molecules thus facilitating entry of dye molecules." *Id.* at Col. 3, lines 67–70. However, in that example it was the use of the quaternary amine (used in the comparison with the Kelly samples) that Moussalli considered determinate as stated in example 1 not the use of the carrier. "The yarn which has been pre-treated with the quaternary amine is found to dye a much darker shade and to a deeper degree of penetration than the sample which was not pre-treated." *Id.* at Col. 4, lines 30–33. (In the Moussalli example 1, the solvent was in the dye bath, not the pretreatment.)

Thus, the Court concludes the distinguishing feature between the Kelly and Moussalli patent is swelling of the substrate rather than the drying step prior to dyeing that yielded the unexpected results. The Court concludes that Plaintiffs made no representations that disclaimed the presence of dye prior to completion of pretreatment. Accordingly, the prosecution history does not support the Defendant's argument.

D. Abstract

Defendant's fourth argument is based on the Abstract of the '168 patent which states:

Polyaramid fiber is swollen, such as by exposing it to a solvent, and while swollen a substance, such as amine or substituted amine, capable of forming an ionic bond with an acid or anionic dye, is introduced into the fiber, after which the fiber is shrunk, such as by drying, to incorporate the substance into it. Thereafter, the fiber can be dyed or printed with an anionic dye.

'168 patent; Abstract.

The title and abstract of the '168 patent definitely implies that the fiber will be dyed after the patented pretreatment is completed, that is, after the fabric is shrunk as the last step of the pretreatment. It can be assumed a patent would not be granted for steps that would be entirely useless if the fiber were not dyed at the conclusion of the pretreatment. This is entirely different than the assertion that there cannot be dye pres-

ent in the fiber to begin with or even during the pretreatment process. What the inventor has shown is that optimal dyeing will occur after the fiber is swollen and a dye site substance that is capable of forming an ionic bond with an anionic dye has been incorporated into the fiber. If no dye is present at that point, there would be no need for the pretreatment and thus there would be no logical and necessary culmination of what is begun in the patented process.

In sum, the Court answers Defendant's and Interveners' first question in the negative. The intrinsic evidence does not establish that the claims of the '168 patent limit introducing or exposing the polyaramid fiber to anionic dye only after completion of the pretreatment process.

## II. Whether the intrinsic evidence establishes that Claims 1 to 11 cover only those processes wherein one substance is used for swelling the polyaramid fiber and a different substance is introduced and subsequently incorporated into the fiber as the dye site substance.

Defendant supports its position by citing the specification and the prosecution history.

First, Defendant argues that two different substances are required, one for swelling the fabric and the other to function as the dye site substance because certain chemicals are stated in the preferred embodiment in the specification.

Second, Defendant relies on the prosecution history. Defendant cites the following: "The present invention involves the following steps: (1) contact the polyaramid with a substance which causes it to swell; (2) contact the swollen polyaramid with a substance which has an affinity for anionic dyes." *See Statement to the United States Patent and Trademark Office* (February 7, 1985). Defendant argues that since Plaintiffs used two different substances during prosecution of the patent to obtain the "unexpected and beneficial results," two different chemical substances are required.

 Claims are not limited to the preferred embodiment unless by their own language. *Karlin v. Surgical Dynamics*, 177 F.3d 968, 973, 50 USPQ2d 1465, 1469 (Fed. Cir.1999). "Although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark*, 156 F.3d at 1187, 48 USPQ2d at 1005; citing *Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d 1560, 1571, 7 USPQ2d 1057, 1064 (Fed.Cir.1988). As the Federal Circuit stated in *Johnson Worldwide Associates, Inc., v. Zebco Corporation*, 175 F.3d 985, 989–90, 50 USPQ2d 1607, 1610 (Fed.Cir.1999), "claim terms cannot be narrowed by reference to the written description or prosecution history unless the language of the claims invites reference to those sources."

 Here, Defendant does not point to any "unclear terms" in independent Claims 1 and 8, and there are none. For example, Claim 1 recites "swelling the fiber" without any limiting language as to the composition of the swelling agent. It further recites "introducing into the swollen fiber a substance." Claim 1 of the '168 patent does not recite any particular chemicals for swelling the fiber and for introducing the dye site substance, nor does it say a different substance. The only qualification is that the substance be "capable of forming an ionic bond with an anionic dye." A chemical substance that is capable of both swelling polyaramid fiber and bonding ionically with an anionic dye would come within the simple straight forward language of Claim 1. Whether a dual-purpose chemical is used to carry out the swelling and dye site introducing steps of the '168 pretreatment process simultaneously or whether two separate chemicals, one dissolved in the other, are used for that purpose, the process is the same; and it is the process which is covered by the claims of the patent.

Nothing in the claims is inconsistent with the use of a single chemical in the swelling stage. Inventors are not required to think of every improvement that can be made on their processes. The possibility that someone may eventually find one substance to do both jobs and to improve or to advance the technology does not mean that this patent

would not cover that improvement. "Advances subsequent to the patent may still infringe." *Marsh–McBirney, Inc. v. Montedoro–Whitney Corp.,* 882 F.2d 498, 504, 11 USPQ2d 1794, 1798 (Fed.Cir.1989). *See also Atlas Powder Co. v. E.I. du Pont De Nemours & Co.,* 750 F.2d 1569, 1581, 224 USPQ 409, 417 (Fed.Cir.1984) (improvement in a step of a patented process, although separately patentable did not avoid infringement under doctrine of equivalents).

In sum, the Court answers the Defendant's and Interveners' second question in the negative. The Court concludes that the intrinsic evidence does not establish that the claims of the '168 patent cover only those processes wherein one substance is used for swelling the polyaramid fiber and a different substance is introduced and subsequently incorporated into the fiber as the dye site substance.

### III. Whether the intrinsic evidence establishes that Claims 1 to 11 are limited to cover only processes using the described amines or substituted amines (or their equivalents) as the dye site substances and do not cover processes using other substances such as amides for the purpose.

Defendant has two arguments.

First, Defendant argues that both independent Claims 1 and 8 are functional claims. It is required under 35 U.S.C. § 112 ¶ 6 that:

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification as equivalents thereof.

35 U.S.C. § 112 ¶ 6. Thus, if the Court were to conclude that Claim 1 and 8 are functional claims, then the pretreatment process is limited to the amines and substituted amines disclosed in the specification.

In *O.I. Corp. v. Tekmar Co. Inc.,* 115 F.3d 1576, 1582–83, 42 USPQ2d 1777, 1782 (Fed. Cir.1997), the Federal Circuit stated with respect to process claims:

[35 U.S.C. § 112, ¶ 6] is implicated only when steps plus function without acts are present . . . If we were to construe every process claim containing steps described by an "ing" verb, such a passing, heating, reacting, transferring, etc., into a step-plus-function limitation, we would be limiting process claims in a manner never intended by Congress.

*Id.*

A functional recitation is a description of an element in terms of the result accomplished or the function served. *Warner–Jenkinson v. Hilton Davis Chem. Co.,* 520 U.S. 17, 27, 117 S.Ct. 1040, 137 L.Ed.2d 146, 41 USPQ2d 1865, 1870 (1997). Because the Court finds that the act of introducing a dye site substance into the swollen fiber is positively recited in the claims, rather than a statement of a step plus function, the interpretation provisions of 35 U.S.C. § 112 ¶ 6 are inapplicable.

Defendant's second argument is based on the specification. Defendant asks this Court to limit the dye site substance to substances identified by name or formula in the specification. The Federal Circuit has stressed that courts may not read limitations from the specification not present in the claims. *E.I. du Pont de Nemours & Co.,* 849 F.2d at 1433, 7 USPQ2d at 1131. However, this is precisely what Defendant asks this Court to do. In the case at bar, Claim 1 is clear where it says "swelling the fiber, introducing into the swollen fiber *a substance* capable of forming an ionic bond with an anionic dye." Col. 4, lines 62–64 (emphasis added). The dye site substance is not limited to an amine or substituted amine in the broadest claim, Claim 1 of the Kelly patent. Because the Court finds no limitations present in Claim 1, it will not read limitations from the specification into the claim.

Further, the doctrine of claim differentiation also supports this claim construction. Different words or phrases used in separate claims are presumed to have different meanings and scope so that limitations stated in dependent claims are not to be read into the independent claim from which they depend. *Karlin,* 177 F.3d at 971–72. *See*

*also Comark Communications Inc. v. Harris Corp.*, 156 F.3d 1182, 1187, 48 USPQ2d 1001, 1005 (Fed.Cir.1998); *Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1277, 35 USPQ2d 1035, 1041 (Fed.Cir.1995). Therefore, dependant Claim 4 which adds the limitation that the dye site substance used in the process of Claim 1 be an amine or substituted amine cannot be read into Claim 1 because it would render Claim 4 superfluous.

■■■ As stated above, Claim 1 covers *any substance* capable of forming an ionic bond with an anionic dye. If an amide will form an ionic bond with an anionic dye, it is covered under Claim 1 of the Kelly patent. If it will not form such a bond, then it is not covered.

In sum, the Court concludes that the intrinsic evidence does not establish that Claims 1 to 11 are limited to cover only processes using the described amines or substituted amines (or their equivalents) as the dye site substances.

### Conclusion

Having discussed the questions posed by the Defendant, the Court now turns to Defendant's and Interveners' proposed claim construction of the '168 patent. After considering the intrinsic evidence (i.e., the claims, the specification, and the prosecution history), the Court concludes as follows:

Regarding Defendant's and Interveners' proposed claim construction (1):[5]

The Court rejects the proposed claim construction and concludes that nothing in the claims of the '168 patent limit it to a process wherein no dye is present prior to or during pretreatment. Dye may be present before and during the pretreatment process, as long as some dye site substance that has not bonded with the dye remains after the pretreatment process has been completed.

Thus, some anionic dye may be introduced into the fiber using a solvent or carrier.

Regarding Defendant's and interveners' proposed claim construction (2):[6]

The Court rejects the proposed claim construction and concludes that Claims 1 to 8 of the '168 patent are not limited to processes wherein the swelling agent and the dye site substance are two different substances. The dye site substance may be any substance within the bounds of a category that meets the specification of Claim 1 that it be "capable of forming an ionic bond with an anionic dye." A chemical substance that is capable of both swelling polyaramid fiber and bonding ionically with an anionic dye comes within the simple, straightforward language of Claim 1. The patent permits either a dual-purpose chemical or two separate chemicals, one dissolved in the other. The process is the same; and it is the process which is covered by the claims of the patent.

Regarding Defendant's and Interveners' proposed claim construction (3):[7]

The Court concludes that Claims 1 to 3 and 7 of the '168 patent are not limited to the dye site substance being an amine or substituted amine. Claim 1 covers *any substance* capable of forming an ionic bond with an anionic dye. If an amide will form an ionic bond with an anionic dye, it is covered under Claim 1 of the Kelly patent. If it will not form such a bond, then it is not covered.

It is hereby ORDERED that the Combined Motion of Defendant and Interveners for Partial Summary Judgment as to Claim Construction is hereby DENIED.

---

**5.** All claims are limited to cover only fiber pretreatment processes that complete incorporation of a dye site substance into the fiber prior to exposure to any anionic dye. They do not cover processes using a solvent or carrier to introduce the anionic dye molecules into the fiber.

**6.** All claims are limited to cover only pretreatment processes using a first substance for swelling polyaramid fibers and then physically incorporating into the fibers a dye site sub-

stance different from the first substance that can form ionic bonds with an anionic dye. They do not cover using the same substance as the solvent or carrier for swelling the fiber and as the dye site substance.

**7.** All claims are limited to cover only processes using certain amines or substituted amines as the dye site substance. They do not cover using an amide as the dye site substance.